928 A.2d 836 (2007)
395 N.J. Super. 196
NEW JERSEY PROPERTY-LIABILITY INSURANCE GUARANTY ASSOCIATION, Plaintiff-Appellant,
v.
HILL INTERNATIONAL, INC., Defendant-Respondent.
Superior Court of New Jersey, Appellate Division.
Argued May 23, 2007.
Decided July 19, 2007.
Peter A. Olsen argued the cause for appellant New Jersey Property-Liability Insurance Guaranty Association (Francis & Berry, attorneys; Mr. Olsen, of counsel and on the brief).
David L. Braverman, Philadelphia, PA, argued the cause for respondent Hill International, *837 Inc. (Braverman Kaskey, attorneys; Mr. Braverman, of counsel and on the brief).
Adam R. Schwartz, Morristown, argued the cause for respondent Fidelity & Deposit Company of Maryland[1] (McElroy, Deutsch, Mulvaney & Carpenter, attorneys; Mr. Schwartz, of counsel; Jonathan P. Vuotto, on the brief).
Before Judges CUFF, FUENTES and BAXTER.
The opinion of the court was delivered by
FUENTES, J.A.D.
In this appeal, we are required to determine whether the New Jersey Property-Liability Insurance Guaranty Association (PLIGA) is liable for a claim filed by the issuer of a surety bond, which acted as the guarantor of the performance of a subcontractor in a school construction project. PLIGA argues that under its legislatively created role as the insurer of last resort, it is not obligated to pay such claims. The trial court disagreed. We affirm.
We hold that the direct negligence claim asserted by the surety against the company now insured by PLIGA is a covered claim under both the policy issued by the insolvent carrier, and the statute defining what is a compensable, covered claim against PLIGA. In this context, we reject PLIGA's argument that the surety's claim here is analogous to the subrogation claim asserted by the workers' compensation carrier in Sussman v. Ostroff, 232 N.J.Super. 306, 556 A.2d 1301 (App.Div.), certif. denied, 117 N.J. 143, 564 A.2d 865 (1989).

I
The Monroe Township Board of Education (Board), retained Hill International, Inc. (Hill) as a construction manager on a school construction project on which William Hughes was the general contractor. Fidelity & Deposit Company of Maryland (Fidelity) issued a performance and payment bond as surety for the work of William E. Snell, Inc. (Snell), the electrical contractor on the project.
One of Hill's responsibilities was certifying to the Board that Snell's applications and certificates for progress payments were accurate and that Snell was entitled to payment in accordance with the work reflected in the request-for-payment applications. Fidelity alleges that during the period of September 1994 through July 1996, Hill and the architect for the school construction project improperly certified to the Board that the work performed by Snell had progressed sufficiently and that Snell was entitled to receive payments. These unwarranted payment authorizations were the proximate cause of the damages incurred by Fidelity as guarantor of Snell's performance.
On July 24, 1996, Snell ceased work on the project, and on August 2, 1996, he filed for Chapter 7 bankruptcy. After Snell ceased work, Fidelity retained contractors to complete the work remaining under Snell's contract. By this time, however, Snell had received all of the payments he was entitled to under its contract with the Board.
From this point, the school construction project degenerated into a quagmire of litigation. The general contractor (William Hughes) sued the Board; the Board sued Fidelity, prompting it to file a *838 fourth-party complaint against Hill for negligence in certifying that the electrical contractor had performed sufficiently and was entitled to payment.
Hill was insured by Reliance National Indemnity Company (Reliance) under a liability policy effective from November 1, 1996, to November 1, 1999. Reliance assumed Hill's defense limited to Fidelity's allegations of negligent supervision over Snell.[2] On October 3, 2001, Reliance was declared insolvent, triggering PLIGA's involvement in the case under the New Jersey Property-Liability Insurance Guaranty Association Act, N.J.S.A. 17:30A-1 to - 20 (Act).[3]

II
Upon assuming Reliance's role, PLIGA filed a declaratory action against Hill, seeking a judicial declaration that it was not required to indemnify Hill. These cases were consolidated by the trial court.
As to Fidelity, PLIGA argues that the claims asserted by this surety are not "covered claims" under N.J.S.A. 17:30A-5d, because the statute prohibits the payment of "any amount due any . . . insurer." Thus, PLIGA maintains that Fidelity's role here is akin to the role of a traditional third-party indemnity carrier. The claims asserted are in essence subrogation claims, assigned to Fidelity by virtue of its contractual arrangement with Hill. In response, Fidelity argues that its direct claims against Hill were incurred in the process of fulfilling its surety obligations under the performance bond.
Fidelity asserted three claims in its lawsuit against Hill: (1) negligent supervision, leading the Board to make overpayments to Snell in connection with the project; (2) gross negligence, leading the Board to make the overpayments; and (3) negligent scheduling and coordination of the project. These claims are in the nature of damages incurred by Fidelity in the process of performing its contractual obligation under the performance bond issued in favor of the Board.
PLIGA nevertheless argues that Fidelity's claims should be viewed as "an amount due to an insurer," rendering it outside the definition of a "covered claim" under N.J.S.A. 17:30A-5d. Specifically, this statute excludes from the definition of covered claims "any amount due any reinsurer, insurer, insurance pool, or underwriting association, as subrogation recoveries or otherwise." (Emphasis added). This argument is without merit.
Here, Fidelity is not asserting a claim against Hill in its capacity as an insurer. Fidelity's action is an independent action against Hill in which Fidelity alleges that it has been directly and personally harmed by Hill's alleged negligence. Fidelity is asserting a claim directly against Hill as an injured tort claimant. For these reasons, PLIGA's reliance on Sussman is misplaced.
In Sussman, we held that a statutory workers' compensation lien for benefits paid to an injured employee by his employer's compensation insurer was not enforceable against PLIGA. Sussman, supra, 232 N.J.Super. at 308, 556 A.2d 1301. The *839 plaintiff was injured in a work-related accident, and was paid workers' compensation benefits by his employer's workers' compensation carrier. Ibid. The plaintiff then brought suit in the Law Division against the owners of the property where his injury occurred. Ibid.
The defense of the action and the obligation to indemnify was taken over by PLIGA when the property owners' liability carrier was declared insolvent. Ibid. PLIGA advised the workers' compensation carrier that the compensation lien did not constitute a "covered claim" under the Act and hence would not be honored. Ibid. Plaintiff settled with PLIGA for $125,000. Id. at 309, 556 A.2d 1301. The workers' compensation carrier then wrote to the plaintiff and demanded payment of the compensation lien out of the settlement funds. Ibid.
We held that the statutory workers' compensation lien for benefits paid to an injured employee by his employer's compensation insurer was not enforceable against PLIGA when it undertakes the defense and indemnification of the tortfeasor whose negligence caused the employee's injury and whose own liability carrier has become insolvent. Id. at 308, 556 A.2d 1301. In so holding, we noted that a compensation lien in which the third-party recovery exceeds the compensation benefits paid, "does not attach to and is not congruent with the injured worker's common-law claim against the tortfeasor." Id. at 313, 556 A.2d 1301. Thus:
Policyholders of solvent property and liability insurers pay only for the protections lost by similarly-covered policyholders of insolvent insurers, and the insurance industry itself bears the risk of loss of its own direct claims against the insolvent carrier, which they may, however, make against the insolvent carrier's receiver.
[Id. at 314, 556 A.2d 1301.]
PLIGA primarily relies on the following passage in Sussman:
[I]rrespective of whatever the technically correct characterization of the nature of the workers' compensation carrier's claim may be, whether lien, subrogation right, or a hybrid of the two, it is ultimately, functionally and conceptually, within the statutory intendment of a claim arising by subrogation or otherwise.

[Id. at 312, 556 A.2d 1301.]
Sussman is factually distinct from this case because of the identity of the claimant in that case. Fidelity is presenting a direct claim sounding in tort against Hill. Sussman involved a workers' compensation subrogation claim against the policyholder. Unlike in Sussman, Fidelity has directly sustained the injury. Its cause of action does not depend on a third party's recovery.

III
There is also strong statutory textual support for excluding Fidelity's claims from the class of claims not covered by PLIGA under N.J.S.A. 17:30A-5d. Under the express language of N.J.S.A. 17:30A-2b, surety bonds are excluded from the Act governing the function and operation of PLIGA:

This act shall apply to all kinds of direct insurance, except life insurance, accident and health insurance, workers' compensation insurance, title insurance, annuities, surety bonds, credit insurance, mortgage guaranty insurance, municipal bond coverage, fidelity insurance, investment return assurance, ocean marine insurance, pet health insurance, and insurance provided by the Motor Vehicle Liability Security Fund
. . . .
*840 [(Emphasis added).]
While surety bonds have been included within definitions of insurance for some purposes, suretyship is not generally considered to be insurance. See, e.g., N.J.S.A. 17:29A-1(e) (defining a "policy of insurance" as including guaranty and surety bonds for purposes of regulating the making and applying of insurance rates). Suretyship is defined as:
a contractual relation resulting from an agreement whereby one person, the surety, engages to be answerable for the debt, default, or miscarriage of another, the principal. The nature of the relation has been defined and characterized in varying language by the courts and by statute. The Restatement of Security[4] defines suretyship as the relation which exists where one person has undertaken an obligation, and another person is also under an obligation or other duty to the obligee, who is entitled to but one performance, and as between the two who are bound, one rather than the other should perform.
[Couch on Insurance § 1:14 (Russ & Segalla eds., 3d ed.2005).]
The differences between an insurer and a surety have been described as follows:
The nature of the risk assumed by the party in the role of "insurer" is a major distinction between insurance and the arrangements of guaranty and surety. As a broad general rule, the risk can be characterized in terms of the degree to which the contingency is within the control of one of the parties. In the classic instance of insurance, the risk is controlled only by chance or nature. In guaranty and surety arrangements, the risk tends to be wholly or partially in the control of one of the three parties. . . .
There is also a difference in the liability of a classic insurer and that of a surety/guarantor. An insurer is the primary party liable upon the occurrence of the contingency, and . . . must bear the ultimate loss. In the classic case of surety or guaranty, on the other hand, the "insurer" is essentially liable secondarily (regardless of how the liability may be labeled for legal analysis). A surety is ordinarily entitled to indemnity from the principal in case the surety is compelled to perform.
. . . .
The essential distinction between an indemnity contract and a contract of guaranty or suretyship is that the promisor in an indemnity contract undertakes to protect his or her promisee against loss or damage through a liability on the part of the latter to a third person, while the undertaking of a guarantor or surety is to protect the promisee against loss or damage through the failure of a third person to carry out his or her obligations to the promisee.
[Couch on Insurance, supra, § 1:18.]
Under the common law, "`[T]he principal and sureties are equally and primarily liable in case of a breach of [the bond's] conditions and the liability of the sureties is, within the terms of the contract and controlling statutes, coextensive with that of the principal.'" In re Estate of Lash, 169 N.J. 20, 28, 776 A.2d 765 (2001) (quoting C.J.S. Executors and Administrators § 349 (1989)). Here, the performance bond issued by Fidelity and submitted to the Board by the electrical contractor, is a statutory requirement for all public school construction projects. N.J.S.A. 2A:44-143a. The form of the bond is strictly prescribed by statute. N.J.S.A. 2A:44-147. The scope of a surety's legal obligation *841 under a performance bond is also statutorily circumscribed:
A surety's obligation shall not extend to any claim for damages based upon alleged negligence that resulted in personal injury, wrongful death, or damage to real or personal property, and no bond shall in any way be construed as a liability insurance policy. Nothing herein shall relieve the surety's obligation to guarantee the contractor's performance of all conditions of the contract, including the maintenance of liability insurance if and as required by the contract. Only the obligee named on the bond, and any subcontractor performing labor or any subcontractor or materialman providing materials for the construction, erection, alteration or repair of the public building, work or improvement for which the bond is required pursuant to this section, shall have any claim against the surety under the bond.
[N.J.S.A. 2A:44-143b (emphasis added).]
Responding to its obligations under the bond, Fidelity assumed responsibility for completing the work its principal failed to do. The claimant under the bond is the beneficiary of the guaranty, the Board. Fidelity's claims against Hill are not grounded on recovering monies paid to a third-party for the damages caused by its principal. It bears emphasis that in its negligence cause of action against Hill, Fidelity seeks to recover monies paid to contractors to complete the work its principal failed to do. The third-party indemnity role assumed by traditional insurance carriers is simply not present here.

IV
We finally address PLIGA's argument that requiring it to pay statutory benefits on behalf of Hill to Fidelity is contrary to the legislative intent and public policy underlying the Act. We find this argument unpersuasive.
The Act was adopted "to protect policyholders of insurance companies which became insolvent." Lehmann v. O'Brien, 240 N.J.Super. 242, 246, 573 A.2d 171 (App.Div.1989).
The purpose of [the Act] is to provide a mechanism for the payment of covered claims under certain insurance policies, to avoid excessive delay in payment, to avoid financial loss to claimants or policyholders because of the insolvency of an insurer, to assist in the detection and prevention of insurer insolvencies, to provide an association to assess the cost of such protection among insurers.
[N.J.S.A. 17:30A-2a.]
PLIGA is the "mechanism" provided by the Act. N.J.S.A. 17:30A-6. Under the Act, PLIGA shall:
(1) Be obligated to the extent of the covered claims against an insolvent insurer . . . ;
(2) Be deemed the insurer to the extent of its obligation on the covered claims and to such extent shall have all rights, duties, and obligations of the insolvent insurer as if the insurer had not become insolvent[.]
[N.J.S.A. 17:30A-8.]
The Act should "be liberally construed to effect the purpose under section 2 which shall constitute an aid and guide to interpretation." N.J.S.A. 17:30A-4a; see also New Jersey Prop.-Liab. Ins. Guar. Ass'n v. Sheeran, 137 N.J.Super. 345, 351, 349 A.2d 92 (App.Div.1975), certif. denied, 70 N.J. 143, 358 A.2d 190 (1976).
Here, it is Hill that is seeking coverage and defense. Whether or not a portion of PLIGA funds are given to Fidelity, Hill remains the ultimate beneficiary of these funds because any judgment entered *842 would be entered against Hill as the defendant in the action. Hill purchased an insurance policy from Reliance to minimize its exposure to charges of professional negligence. Hill turned to its insurer when it was named as a defendant in the underlying litigation under charges that it was negligent in the conduct of its business. Reliance, as Hill's insurer, owed its duties to Hill and not to the party suing Hill. Under the Act, "protection is afforded by the Guaranty Association's assumption of the insolvent carrier's direct and indemnification obligations." Sussman, supra, 232 N.J.Super. at 307, 556 A.2d 1301. In this matter, PLIGA must assume Reliance's obligations to Hill.

V
For the reasons stated herein, the judgment of the Law Division is affirmed.
NOTES
[1] Fidelity & Deposit Company of Maryland filed a fourth-party complaint against Hill International, Inc. When Reliance National Indemnity Co., the insurance carrier for Hill International, declared insolvency, PLIGA assumed the defense of the action.
[2] Reliance disclaimed coverage for allegations concerning events outside the policy's coverage period. Hill has not contested this issue.
[3] On December 22, 2004, the Legislature approved substantial revisions to the Act. These revisions apply prospectively to insolvencies occurring on or after that date. L. 2004, c. 175, § 9. Reliance was declared insolvent on October 3, 2001, and therefore the version of the Act pre-dating the amendments must be applied.
[4] Restatement of Security § 82 (1941).