944 A.2d 667 (2008)
399 N.J. Super. 315
NEW JERSEY DIVISION OF TAXATION, Plaintiff-Appellant/Cross-Respondent
v.
SELECTIVE INSURANCE COMPANY OF AMERICA, Defendant/Third-Party Plaintiff-Respondent/Cross-Appellant,
v.
Abraham S. Stahl, Mark L. Stahl and The Estate of Ester L. Stahl, Third-Party Defendants.
Superior Court of New Jersey, Appellate Division.
Submitted February 25, 2008.
Decided March 28, 2008.
*668 Anne Milgram, Attorney General, for appellant/cross-respondent (Patrick DeAlmeida, Assistant Attorney General, of counsel; James M. Bennett, Deputy Attorney General, on the brief).
McElroy, Deutsch, Mulvaney & Carpenter, L.L.P., Morristown, for respondent/cross-appellant (Louis A. Modugno, of counsel and on the brief; Christopher E. Kunkel, on the brief).
Before Judges PARRILLO, S.L. REISNER and GILROY.
The opinion of the court was delivered by S.L. REISNER, J.A.D.
Plaintiff New Jersey Division of Taxation (Division) appeals from a November 17, 2006 trial court order, dismissing its complaint against defendant Selective Insurance Company of America (Selective) because the complaint was filed beyond the ten-year statute of limitations generally applicable to claims filed by the State, N.J.S.A. 2A:14-1.2a.[1] Selective has cross-appealed, contending that the trial court should have applied the two-year statute of *669 limitations for motor fuels tax bonds, N.J.S.A. 54:39-20.[2]
We hold that the ten-year statute of limitations applies, because the tax obligor's seller/user license was neither revoked nor canceled within the meaning of N.J.S.A. 54:39-20. We reject the Division's contention that the statute of limitations is triggered by the surety's refusal to pay on the bond, and hold instead that the limitations period began to run when the taxpayer's tax obligations came due. Because some of those obligations may have come due within the ten-year time period, we affirm in part and remand in part.

I
This case arises from the failure by the operator of a motor fuels service station to pay taxes. The operator, A & T Paramus t/a International Motor Plaza (A & T), applied for a seller/user license required for a seller of special fuels such as kerosene and diesel. See N.J.S.A. 54:39-64.1; N.J.A.C. 18:18-5.1. As a condition of obtaining the license, A & T was required to obtain a motor fuels tax bond, which it obtained from Selective in the amount of $200,000.[3] The bonding statute, N.J.S.A. 54:39-64.2, provides:
A seller of special fuels and user of special fuels, may, at the discretion of the director . . . be required to file a bond with the director in an amount not greater than three times the tax on the greatest amount of motor fuels handled during any one month of the previous 12 months. . . . Such bond shall . . . be executed by a surety company duly licensed to do business under the laws of the State of New Jersey, and be conditioned upon the prompt filing of true reports and the payment by the licensee to the director of all motor fuels taxes which are now or which hereafter may be levied or imposed by the State of New Jersey.
By its terms, the bond covered the period from August 2, 1994, to the date A & T's license was suspended or revoked for cause "or otherwise cancelled" or the surety was "properly released and discharged as to future liability." A & T failed to pay the motor fuels taxes it owed for the period March 1994 to May 1996.[4] The Division filed certificates of debt, having the effect of judgments against A & T, in 1995 and 1996. See N.J.S.A. 54:49-12.[5] A & T filed for bankruptcy on June 4, 1996. Selective canceled the surety bond effective *670 August 2, 1996. A & T's license, which had been renewed for a three-year period in April 1995, lapsed at the end of March 1998.
The Division first attempted to invoke its rights under the surety bond through a June 20, 1995 letter to Selective requesting payment of A & T's delinquent taxes. This was followed by correspondence in June of 1996. The next communication was not until February 17, 2000, when the Attorney General's Office wrote Selective's agent a letter threatening action to collect on the bond. In a letter dated March 30, 2000, Selective's attorney asserted that the bond was not an asset of A & T's bankruptcy estate and indicated that Selective refused to pay on the bond as long as the taxpayer had funds to pay the debt.
Following some additional correspondence, there was a five-year hiatus until October 25, 2005, when the Attorney General's Office once again sent Selective a letter demanding payment on the bond and threatening litigation. The A & T bankruptcy was terminated by a final order on January 12, 2006. The Division filed its complaint on the bond on February 21, 2006.
In response, Selective filed a motion for summary judgment. Both sides agreed that there were no material facts in dispute. Selective asserted that the State's claim arose at the latest on June 20, 1995, when it sent Selective a letter demanding payment on the bond. Counsel asserted, "It's not insurance, there's no tolling where we have to actually refuse to pay and then there would be an accrual from that point forward." The Division argued that its claim did not accrue until Selective repudiated its claim. The Division also argued that the two-year statute of limitations under the motor fuel tax bond statute did not apply because the license was never canceled.
In an oral opinion placed on the record on November 17, 2006, the trial judge found that the Division made two demands on Selective for payment, one on June 20, 1995, and the other on June 3, 1996. He concluded that the Division never canceled A & T's license, and therefore the two-year limitations period of N.J.S.A. 54:39-20 did not apply. He concluded that N.J.S.A. 2A:14-1.2 set forth the applicable ten-year limitations period.
The judge concluded that cases adjudicating claims based on first-party insurance policies were not on point, thus rejecting the Division's argument that its cause of action would not arise until Selective refused payment.
[T]his is not a standard contract of insurance as was the case in [Shelter Mut. Ins. Co. v. Nash, 357 Ark. 581, 184 S.W.3d 425 (2004)]. This was a surety arrangement in which A & T and Selective had entered into an agreement that Selective would provide the surety guarantee to the State with regard to the motor fuels tax. The State was not a signator[y] to any contract of insurance . . . as was the case in Shelter.

. . . [T]he State was on notice no later than June 20th, 1995 that it had a claim against Selective for their non-payment of fuels tax by A & T. That's evidenced by the letter . . . from Henry Ryan, supervisor of the Division of Taxation to Selective [dated June 20, 1995].
Because the suit was not filed until "over ten and a half years" after the State sent its demand letter, the judge concluded that the complaint was "outside . . . the ten-year limitation period" of N.J.S.A. 2A:14-1.2, and was therefore subject to dismissal as untimely.

II
Our review of the trial court's grant of summary judgment is de novo. *671 Prudential Prop. & Cas. Ins. Co. v. Boylan, 307 N.J.Super. 162, 167, 704 A.2d 597 (App.Div), certif. denied, 154 N.J. 608, 713 A.2d 499 (1998). In reviewing the record, we employ the same Brill[6] standard that the trial court is required to use in adjudicating a summary judgment motion. Ibid. In this case, the essential facts were undisputed and the matter was ripe for summary judgment.

A.
The first issue presented is whether N.J.S.A. 54:39-20 or N.J.S.A. 2A:14-1.2 sets forth the applicable statute of limitations.[7] By its terms, N.J.S.A. 2A:14-1.2 applies unless a different "limitations provision expressly and specifically applies to actions commenced by the State." While N.J.S.A. 54:39-20 applies to some actions commenced by the State to enforce a motor fuel tax surety bond, it does not apply here. The statute sets a two-year limitations period running "from the date of revocation or cancellation" of the license. Ibid. In this case, A & T's license was neither revoked nor canceled.
We infer that the statute only applies to revocation or cancellation of ordinary motor fuels licenses, and not to expiration or nonrenewal of those licenses, because the next phrase of the statute specifically provides that it also applies "from the date of expiration or nonrenewal of a gasoline jobber's license." Ibid. (emphasis added). If the Legislature intended the two-year period to run from the expiration or nonrenewal of a license other than a gasoline jobber's license, we presume it would have so stated. Moreover, there is no dispute that A & T held a seller/user of special fuels license, see N.J.S.A. 54:39-64.1, and not a gasoline jobber's license. See N.J.A.C. 18:18-3.3(a).[8] We, therefore, conclude that the ten-year limitations period of N.J.S.A. 2A:14-1.2 applies to the Division's claim.

B.
The next question we must address is whether the complaint was filed within the ten-year time limit. The Division contends that "surety bonds are treated substantively as insurance contracts" and that the statute of limitations begins to run "at the time of the breach," which the Division urges occurs when the surety refuses to pay on the bond. Following this logic, the Division asserts that the statute of limitations has not even begun to run because Selective never actually refused to make payment.
On the other hand, Selective contends that a surety's obligation is coextensive with that of the principal, and that the third-party beneficiary of the bond has the right to file suit against the surety as soon as the principal defaults. Selective urges that the ten-year time limit should be measured from June 20, 1995, the date of the Division's demand letter.
The cases the Division cites do not support its argument, because they deal with first-party insurance contracts.[9] *672 The surety contract here was a first-party contract between A & T and Selective, but it created a third-party beneficiary relationship between Selective and the Division.
"Suretyship is a contractual relation resulting from an agreement whereby one person, the surety, engages to be answerable for the debt, default or miscarriage of another, the principal." . . . "The Law recognizes that the third party [beneficiary of the contract] has an enforceable right if the surety promises in the bond, either in express words or by reasonable implication, to pay money to him."
[Eagle Fire Protection Corp. v. First Indemn. of Am. Ins. Co., 145 N.J. 345, 353-54, 678 A.2d 699 (1996) (citations omitted).]
As the Court described the relationship in Cruz-Mendez v. ISU/Insurance Servs., 156 N.J. 556, 568, 722 A.2d 515 (1999),
[a] traditional suretyship contract involves three parties: an obligee who is owed a debt or duty; a primary obligor, who is responsible for the payment of the debt or performance of the duty; and a secondary obligor, or surety, who agrees to answer for the primary obligor's debt or duty. An obligee may bypass the primary obligor and enforce the obligation directly against the surety.
An obligee, or "`[a] third party beneficiary's[,] rights depend upon, and are measured by, the terms of the contract between the promisor and the promisee.'" See Eagle Fire, supra, 145 N.J. at 354, 678 A.2d 699 (citations omitted). "The availability of a direct action against the secondary obligor distinguishes a `surety' contract from contracts of guaranty and indemnity." Cruz-Mendez, supra, 156 N.J. at 568, 722 A.2d 515.
Further, we have recognized that suretyship and liability insurance are different. "While surety bonds have been included within definitions of insurance for some purposes, suretyship is not generally considered to be insurance." New Jersey Property-Liability Ins. Guar. Ass'n v. Hill Intern., Inc., 395 N.J.Super. 196, 202, 928 A.2d 836 (App.Div.2007). An obligee for whose benefit the obligor obtains a surety bond may proceed on the bond when the obligor defaults:
Under the common law, "`[T]he principal and sureties are equally and primarily liable in case of a breach of [the bond's] conditions and the liability of the sureties is, within the terms of the contract and controlling statutes, coextensive with that of the principal.'" In re Estate of Lash, 169 N.J. 20, 28, 776 A.2d 765 (2001) (quoting 34 C.J.S. Executors and Administrators § 900 (1998)).
[Id. at 203, 928 A.2d 836.]
As Justice Heher stated in Westville Land Co. v. Handle, 112 N.J.L. 447, 452, 171 A. 520 (Sup.Ct.1934),
There is an essential difference, in legal effect, between covenants of indemnity, strictly  that is, of indemnity against loss  and covenants to pay, or assume or stand for the debt, or a surety's liability thereon. A right of action accrues on those of the latter class as soon as the debt matures and is unpaid, because the liability then becomes absolute, and the failure to pay is a breach of the express terms of the covenant.
*673 "[A] surety's liability will accrue at the same time as the principal's liability." In re Integrity Ins. Co., 147 N.J. 128, 147, 685 A.2d 1286 (1996) (Handler, J. dissenting) (citing Am.Jur. Surety § 141; C & L Rural Electric Co-op Corp. v. American Casualty Co., 199 F.Supp. 220 (E.D.Ark. 1961).)[10]
The Division's reliance on Shelter Mut. Ins. Co. v. Nash, 357 Ark. 581, 184 S.W.3d 425 (2004), is misplaced, because that case addressed first-party underinsured motorist (UIM) insurance. The court there held that the insured's cause of action against the insurer accrued when the insurer breached the contract by refusing to pay the claim, and not on the date of the automobile accident giving rise to the underlying claim for coverage.[11]
Arkansas law is clear that a cause of action accrues the moment the right to commence an action comes into existence, and the statute of limitations commences to run from that time. A cause of action for breach of contract accrues the moment the right to commence an action comes into existence, and occurs when one party has, by words or conduct, indicated to the other that the agreement is being repudiated or breached. In ordinary contract actions, the statute of limitations begins to run upon the occurrence of the last element essential to the cause of action. And if the right of action depends upon some contingency or a condition precedent, the cause of action accrues and the statute of limitations begins to run when the contingency occurs or the condition precedent is complied with.
The majority of courts that have considered this question have concluded that the statute of limitations begins to run on a cause of action for benefits under an underinsured motorist provision of an automobile insurance policy when the insurance contract is breached.
[Id. at 428-29 (citations omitted).]
The court reasoned that the insured's right to claim UIM benefits would not be known at the time of the accident and hence, the cause of action could not accrue at that time:
Because underinsured motorist benefits are not available until it is apparent that the tortfeasor's coverage is insufficient to compensate the insured, we reject Shelter's argument that the statute of limitations begins to run when the accident occurs. To adopt Shelter's reasoning would lead to absurd results, because at the time of the accident, it is impossible for an insured to know the extent of his or her injuries, the extent of the tortfeasor's insurance coverage, and whether the tortfeasor's coverage will be sufficient to compensate the insured. Further, because Arkansas law is clear that no breach-of-contract cause *674 of action accrues until the contract is breached or repudiated, we follow the majority of jurisdictions that hold that the statute of limitations does not begin to run until the contract of insurance is breached.
[Id. at 430.]
However, Arkansas law concerning the accrual of a claim against a surety is different. The Supreme Court of Arkansas recognizes the rule that a claim against a surety accrues at the time the principal defaults.
The trial judge relied on U.S.F. & G. v. Fultz, 76 Ark. 410, 89 S.W. 93 (1905), which provides that a claim against a surety arises upon the principal's default. We agree. A claim against a surety does not arise until the obligee suffers actual damage. C. & L. Rural Electric Co-op. Corp. v. American Cas. Co., 199 F.Supp. 220 (W.D.Ark.1961).
[Arkansas State Highway Com. v. Union Indem. Ins. Co., 295 Ark. 273, 748 S.W.2d 338, 339 (1988).]
In C & L Rural Electric Co-op Corp. v. Am. Cas. Co., supra, which the Arkansas Supreme Court cited with approval, a Federal District Court sitting in diversity made a similar construction of Arkansas law:
It is a well settled principle that a cause of action for indemnity under a contract . . . accrues when the obligee suffers actual damage, including financial loss occasioned by the payment of money. 27 Am.Jur. Indemnity, §§ 20, 21, and 24; 42 C.J.S. Indemnity § 14(c), pp. 589-591; Carter v. Adamson, 21 Ark. 287.
It is also well established that ordinarily an obligee's cause of action against his obligor's surety accrues at the same time as does the cause of action against the principal obligor, and that it is not necessary for the principal's obligation to be settled or determined before the obligee can proceed against the surety. See in this connection: 50 Am.Jur. Suretyship, §§ 79, 183-184; 72 C.J.S. Principal and Surety §§ 251, 252, 263.
[C & L Rural Electric Co-op. Corp., supra, 199 F.Supp. at 222.]
See also Bloom v. Bender, 48 Cal.2d 793, 313 P.2d 568, 572 (1957) ("The general rule is that the liability of a surety (in the absence of a different contractual provision) accrues at the same time as that of the principal, or upon default of the principal."); Gen. Motors Acceptance Corp. v. Daniels, 303 Md. 254, 492 A.2d 1306, 1309 (1985) ("[T]he surety is primarily or jointly liable with the principal obligor and therefore is responsible at once if the principal obligor fails to perform." (citations omitted)); Bernard v. Ohio Cas. Ins. Co., 79 N.C.App. 306, 339 S.E.2d 20, 23 (1986) ("Although the surety's obligation depends upon a valid obligation of the principal, the surety may be sued immediately when the principal becomes liable to a third party on an obligation covered by the suretyship contract.")
We, therefore, conclude that the ten-year limitation period must be calculated from the date A & T's tax debts became due and owing, and not from the date the surety declined to make payment on the bond.
The Division's remaining appellate contentions are without sufficient merit to warrant discussion in a written opinion, R. 2:11-3(e)(1)(E), beyond the following comments. We find no merit in the Division's claim that the bond was part of A & T's bankruptcy estate, a contention that is contrary to well-established law. See, e.g., In re Dunbar, 235 B.R. 465, 476 (9th Cir.BAP1999), aff'd, 245 F.3d 1058 (9th Cir.2001); Globe Constr. Co. v. Oklahoma City Hous. Auth., 571 F.2d 1140, 1143 (10th Cir.1978), cert. denied, 439 U.S. 835, 99 S.Ct. 117, 58 L.Ed.2d 131 (1978). *675 We likewise find no merit in the Division's contention that Selective's requests for proof of A & T's tax debt justified the Division's ten-year delay in commencing litigation to collect on the bond. Putting aside the question of whether the tax record confidentiality statute, N.J.S.A. 54:50-8, applied to Selective's request for information about its insured's tax liability, the Division would have had to produce proof of its claim in the course of any litigation to collect on the bond.
Finally, we address an issue not raised by either party, but which the record plainly suggests to us. The Division's claim was based on A & T's failure to pay taxes for the months of October 1995 through May 1996. Because the Division filed its complaint on February 2, 2006, any tax debts that A & T first incurred[12] between February 3, 1996 and May 1996 would be within the ten-year statute of limitations. Although the Division first made a demand for payment on the bond in June 1995, it could not have demanded payment on the bond for A & T's tax obligations that had not yet accrued. See Westville Land Co., supra, 112 N.J.L. at 452, 171 A. 520; In re Integrity Ins. Co., supra, 147 N.J. at 151, 685 A.2d 1286 (Handler, J., dissenting).
Moreover, since the surety's obligation was joint and several with that of the obligor, and came into being when A & T's tax liabilities became due, ibid., and since the bond itself did not require a demand prior to enforcement, it was not necessary for the Division to make a demand on the surety or for the surety to refuse the demand, in order for the statute of limitations to begin to run. See Gen. Motors Acceptance Corp. v. Daniels, supra, 492 A.2d at 1309. Consequently, while we affirm the trial court's decision to dismiss the Division's claims against the surety that were based on A & T's pre-February 3, 1996 tax obligations, we remand this matter to the trial court for further proceedings with respect to any obligations arising on or after that date but prior to the cancellation of the surety bond.
Affirmed in part, remanded in part.
NOTES
[1] This section provides in pertinent part: "Except where a limitations provision expressly and specifically applies to actions commenced by the State or where a longer limitations period would otherwise apply, . . . any civil action commenced by the State shall be commenced within ten years next after the cause of action shall have accrued."
[2] This section provides in relevant part: "Every bond hereafter filed with and approved by the [Taxation] director shall, without the necessity of periodic renewal, remain in force and effect until such time as the distributor's license, importer's license, or gasoline jobber's license of which it is a part is revoked for cause or otherwise canceled, or in the case of a gasoline jobber's license, has expired. No action on a bond shall be begun after two years from the date of revocation or cancellation of the license of which it is a part or from the date of expiration or nonrenewal of a gasoline jobber's license."
[3] Under the terms of the bond, Selective and A & T were jointly and severally bound to make payment.
[4] Selective's brief agrees that the alleged defaults by A & T in paying its taxes "continued almost monthly from October 1995 through May 1996 and the tax deficiency continued to accrue." We do not take this as a concession that the taxes were due, but rather as an agreement that the Division's claim was based on taxes alleged to have become due and owing in the months of October 1995 through May 1996.
[5] "The making of the entries shall have the same force and effect as the entry of a docketed judgment . . ., and the director shall have all the remedies and may take all of the proceedings for the collection thereof which may be had or taken upon the recovery of a judgment . . ." Ibid.
[6] Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540, 666 A.2d 146 (1995).
[7] In its brief, Selective abandoned its reliance on the six-year statute of limitations set forth in N.J.S.A. 2A:14-1.
[8] A gasoline jobber is a wholesale seller of fuel to retail dealers and "other large consumers." See N.J.A.C. 18:18-1.1. The regulations make clear that a jobber's license is distinct from a seller/user license. See N.J.A.C. 18:18-3.3(c).
[9] Matter of Liquidation of Integrity Ins. Co., 251 N.J.Super. 501, 598 A.2d 940 (Ch.Div. 1991), is not on point because it concerned the rights of surety-bond holders against the estate of an insurance company in liquidation; the case had nothing to do with the time of accrual of a cause of action on a surety bond.
[10] We cite Justice Handler's dissent, because the issue in Integrity was not whether the claim against the surety, Integrity Insurance Company, had accrued. The issue was the permissible amount the obligee could claim in an insolvency proceeding involving Integrity. Id. at 134, 598 A.2d 940. Analyzing Integrity's insolvency as a breach of contract, under the common law pertaining to insurer insolvencies, id. at 135, 598 A.2d 940, the majority held that "any policyholder whose insured risk was no longer insurable on the date of default should be entitled to file a claim for the full amount of the policy, less amounts already paid and amounts recoverable from the debtors." Id. at 140-41, 598 A.2d 940. The dissent, on the other hand, reasoned that the obligee's claim for installment payments that were due after the bonds terminated should be denied, id. at 153, 598 A.2d 940, because "a surety is liable only for a debt that is already owing." Id. at 154, 598 A.2d 940.
[11] Likewise, in Palmero v. Aetna Cas. & Surety Co., 606 A.2d 797, 798 (Me.1992), the issue was "[w]hether this type of action [against the UIM carrier] accrues at the time of injury or when benefits are denied."
[12] Thus, this portion of our opinion does not apply to A & T's tax obligations that came due prior to February 3, 2006.